# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

**BRYAN TURNER,**                                          **CASE NO.: 3:19-cv-00641-TJC-PDB**

      **Plaintiff,**

**v.**

**MIKE WILLIAMS, as SHERIFF OF THE
CITY OF JACKSONVILLE AND OF DUVAL
COUNTY; MIKE WILLIAMS, individually;
BILL LEEPER, as SHERIFF OF NASSAU
COUNTY; and BILL LEEPER, individually,**

      **Defendants.**
_____/

## SECOND AMENDED COMPLAINT

Plaintiff, BRYAN TURNER, hereby sues Defendants, MIKE WILLIAMS, as SHERIFF

OF THE CITY OF JACKSONVILLE AND OF DUVAL COUNTY; MIKE WILLIAMS,

individually; BILL LEEPER, as SHERIFF OF NASSAU COUNTY; and BILL LEEPER,

individually, and alleges:

### NATURE OF THE ACTION

1.      This is an action brought under 42 U.S.C. §1983 (deprivation of civil rights),

which authorizes actions to redress the deprivation, under color of state law, of rights, privileges,

and immunities secured to Plaintiff by the Constitution and laws of the United States; and under

42 U.S.C. §1988, which authorizes the award of costs and attorney's fees to prevailing plaintiffs

in actions brought under 42 U.S.C. §1983.

2.      This is also an action brought under 42 U.S.C. §1985 (conspiracy to interfere with

civil rights); and under the common law of Florida.

3.      This action involves claims which are, individually, valued in excess of fifteen thousand dollars ($15,000), exclusive of costs and interest.

## PARTIES

4.      At all times pertinent hereto, Plaintiff, BRYAN TURNER, has been a resident of Florida, and is *sui juris*.

5.      At all times pertinent hereto, Defendant, MIKE WILLIAMS, as SHERIFF OF THE CITY OF JACKSONVILLE AND OF DUVAL COUNTY ("JAX SHERIFF"), is sued in his official capacity as sheriff within the Jacksonville Sheriff's office. The Jacksonville Sheriff's Office is a joint city-county law enforcement agency, which has primary responsibility for law enforcement, investigation, and corrections within the consolidated City of Jacksonville and Duval County, Florida. Defendant JAX SHERIFF has been organized and existing under the laws of Florida.

6.      At all times pertinent hereto, Defendant, MIKE WILLIAMS, individually, has been a resident of Florida. Defendant WILLIAMS is sued in his individual capacity and is *sui juris*.

7.      At all times pertinent hereto, Defendant, BILL LEEPER, as SHERIFF OF NASSAU COUNTY, FLORIDA ("NASSAU SHERIFF"), is sued in his official capacity as sheriff of Nassau County, Florida. Defendant NASSAU SHERIFF has been organized and existing under the laws of Florida as a law enforcement agency known as the Nassau County Sheriff's Office.

8.      At all times pertinent hereto, Defendant, BILL LEEPER, individually (in conjunction with Defendant WILLIAMS, "the Individual Defendants"), has been a resident of Florida. Defendant LEEPER is sued in his individual capacity and is *sui juris*.

## CONDITIONS PRECEDENT

9.      All other conditions precedent to the bringing of this action have been satisfied.

## BACKGROUND FACTS

10.      In or about 2008, as a then-resident of Nassau County, a fourteen-year deputy in the employ of Defendant NASSAU SHERIFF, and at that time holding the rank of sergeant, Plaintiff retired from Defendant NASSAU SHERIFF's employ. He immediately accepted a similar position with Defendant JAX SHERIFF. While it is customary for retiring deputies to be given both their badges and retired deputy identification cards, based on clerical error, Plaintiff was only given his badge at that time. However, because unlike many other retirees Plaintiff was staying in law enforcement and immediately taking a position with the JAX SHERIFF, he had no immediate need for a retired deputy identification card, and for that reason did not seek to remedy the oversight at that time.

11.      Defendant LEEPER was first elected as sheriff of Nassau County in 2012. During the period leading up to election day of 2016, while running for re-election, Defendant LEEPER made it known that while seeking a second term in that position, he would not run for a third term in 2020.

12.      Aware of Defendant LEEPER's intention to step down after a second term, beginning in the summer of 2016—i.e., even prior to the 2016 election—Plaintiff began communicating to everyone he knew, and specifically within Defendants JAX SHERIFF and NASSAU SHERIFF, including communication to WILLIAMS his intention to run for the position of sheriff of Nassau County in 2020 against Roy Henderson.

13.    By early 2017, Plaintiff had been employed for approximately nine years by Defendant JAX SHERIFF, and in his two deputy positions combined had worked in narcotics squads for a total of ten years.

14.    Working undercover as part of Defendant JAX SHERIFF's narcotics squad in early February 2017, Plaintiff was teamed with other undercover officers. In working undercover, the officers' standard procedure was to pose as drug buyers and proceed to buy drugs on the street, which purchases would constitute the bases for subsequent arrests of drug sellers. In these undercover positions, Plaintiff and other undercover officers necessarily located themselves in less affluent neighborhoods where the drug trade is more prevalent and more visible. And in inserting themselves into such neighborhoods and interacting with the drug buying and selling community, almost without exception the undercover officers kept beer and cigarettes in their vehicles, items in the nature of "props," even "currency" used in interacting with buyers, sellers, and informants. While Plaintiff and other team members generally kept beer in their vehicle while working undercover, even open cans of beer, Plaintiff did not drink the beer. On that issue, given the dangerous conditions and possibility of events such as that described in the following paragraphs, Plaintiff never drank while working undercover, preferring to function in an alert—and sober—mental state.

15.    On or about February 6 2017, Plaintiff was working overtime as part of  a team, being called in because there was no one else available to serve as protection for Kyle Kvies, with two other undercover narcotics officer teammates, all three of them white, one of whom, Kyle Kvies, was new in the position and had no experience. He was previously a patrol officer working with an entirely different set of protocol and procedures regarding the use of bee.  The three officers drove in an unmarked Jeep Cherokee owned by Defendant JAX SHERIFF. The

purpose of the actions of the team on that day was to teach and provide experience to Kvies. In the vehicle, Plaintiff was seated in the front passenger seat, and Kvies was seated in the back.

16.     In furtherance of training Kvies, the planned action involved making contact with someone from whom the team had previously bought drugs, a black male, giving that person the necessary funds, and having him obtain and provide to them a modest amount of cocaine. Kvies would observe his teammates and participate, and as such learn how to function undercover.

17.     This action began when the team picked up the third-party, who sat in the backseat of their vehicle next to Kvies. After giving money to the third-party, the team drove him to a location where he said he would be able to obtain cocaine for the team. At that location, the third-party exited the vehicle, walked around a corner, and soon returned, informing the team that there was no deal for cocaine to be had at that location, and asked the team to proceed to the corner of 5th Street and Barnette Street for the purpose of the purchase. Of interest, unbeknownst to the team, the third-party either already had the cocaine on his person when they first picked him up, or actually bought some at the first stop when he walked around a corner out of view. Plaintiff understands the miscommunication to have simply been a way for him to obtain a ride to the next location.

18.     At the corner of 5th Street and Barnette Street, initially, and without the team's notice, the third-party removed a small package of cocaine from his pocket and placed it on the backseat floor. He then exited the vehicle, ostensibly to find a supplier and buy cocaine, walked three or four steps to the front of the vehicle, then reversed course and walked the same three or four steps back to the rear door. At the rear door, he looked into the open window, and pointing to the package of cocaine on the floor told Kvies, "looks like you dropped something." This

statement, obviously untrue, was a rather standard—though legally misinformed--way of him distancing himself from having obtained, sold, and delivered the cocaine to purchasers.

19.     The very next moment, a black man approached the vehicle, specifically approaching the front passenger seat occupied by Plaintiff, and from just a few feet away pointed a handgun directly at Plaintiff's head. Suddenly thrust into a life-or-death situation, and quite naturally interested in shooting rather than being shot, Plaintiff acted to distract the gunman by staring over his shoulder and behind him, as if someone was approaching. The bluff worked, and when the gunman turned his head momentarily to look in that direction, Plaintiff was able to unholster his service weapon and take multiple shots at the gunman. While not all of those multiple shots landed, enough did, and the gunman fell to the ground dead.

20.     Because of the trauma associated with encountering a life-threatening situation and killing a man, referred to as an officer-involved shooting or OIS, Plaintiff has no recollection of the number of times he shot at third-part; no recollection of Kvies talking to him or that he responded, no recollection of certain persons who were at the scene.

21.     For weeks post OIS, Plaintiff suffered from post-traumatic, psychological, emotional and mental health experiences including repetitious thinking every time he closed his eyes that he was at the scene of the shooting and that he was going to be shot by another person at the scene and would not see his children again.

22.     At the moment of the OIS, all three team members exited the vehicle, guns drawn, fearful that the gunman was not alone and that additional dangerous shooters might be close by. None were observed.

23.     As the team exited the vehicle and scanned the area, <u>within 20 seconds of the OIS</u>, Kvies was recorded on his iPhone as stating, "Hey, get all the beer."  Plaintiff has no memory of this statement or of a response to the statement.

24.     Kvies, a rookie, was not familiar with the standard operating procedure requiring the use of beer props for undercover officers and as a patrol officer, new to undercover work, believed that the beer in the car would result in termination as it would for a patrol officer.

25.     A subsequent review of the iPhone audio made of the event revealed that Plaintiff answered, in a distant and disinterested manner, "yeah." Kvies proceeded to dispose of two unopened cans of beer cans and one opened bottle of beer that were in the vehicle as Props.

26.     Kvies threw them into a nearby yard.

27.     Kvies and Griffis, unbeknownst to Plaintiff, engaged in additional conversation and concern over the beer props and their disposition.

28.     At <u>20 seconds post OIS</u> Plaintiff was operating on mental autopilot.  Plaintiff was experiencing sensory distortions, distortions in perception of time, significant distortion in perception of what would constitute a risk or a danger, perception and behavior dissociation.  He had just shot and killed a man and was extremely alert to the extreme risk of others shooting at him, Kvies and Griffis.

29.     Plaintiff experienced the trauma induced conditions of an OIS rendering him incapable of satisfying the elements of Section 918.13 Fla. Stat. or Section 777.04(3) Fla. Stat.

30.     The possession—and even ingestion—of beer by undercover officers is specifically permitted by Defendant JAX SHERIFF and included in their standard operating procedure.

31.     It is patently clear from this event that JAX SHERIFF  and WILLIAMS failed to properly train Kvies before sending him out as an undercover officer and that lack of training resulted in his concern about beer props authorized by SOP at a time when he should have been focused on protecting his own life and the life of his fellow officers.

32.     As a result of the OIS, a large number of officers of Defendant JAX SHERIFF quickly arrived on the scene, as many as twenty. The first to speak to Plaintiff in violation of SOP for OIS, were a group of three: Plaintiff's lieutenant, Claude Ayoub, his sergeant, Clayton Short, and a Fraternal Order of Police ("FOP") lawyer, William Vogalsang, the latter there in protection of Plaintiff's interests. Ayoub and Short asked almost simultaneously of Plaintiff, "have y'all been drinking," to which Plaintiff responded, "no, but there is beer in the car."

33.     Although the Disposition Statement, attached hereto as Exhibit "B" and incorporated herein by reference,  identifies the vehicle as a "death investigation scene", neither JAX SHERIFF nor any other person or entity ever inspected the vehicle or its contents, or secured the vehicle or processed it as evidence let alone a "death investigation scene", or they would have learned that the beer was not in the car at that time.

34.     Plaintiff's acknowledgement that there was beer in the car upon being asked by Ayoub and Short reveals that all at the scene knew or should have known that the vehicle should have contained beer props, yet the responding officers and JAX SHERIFF failed to secure the vehicle and its contents, or to account for the beer props that evening.

35.     That Plaintiff telling Ayoub and Short that beer was in the car was not shown to be inaccurate until the following day, when Kvies admitted to throwing away beer props, and took investigators to the location where the beer props were discarded.

36.     Contrary to Plaintiff's statements at the scene of the OIS to Ayoub and others, Kvies and Griffis lied to Ayoub and Short and both said that there was no beer in the car and did not disclose that they had thrown away the beer props.

37.     No prudent man would believe that Plaintiff would have removed or participated in the removal of the beer props to hamper or impair the investigation of the OIS under the circumstances and facts of this case.

38.     Plaintiff's utterance, 20 seconds after the OIS, was impermissibly obtained and placed in the Affidavit for Arrest Warrant against SOP and other guidelines in place to protect officers involved in an OIS from being interviewed until cleared by a physician.

39.     This Affidavit for Arrest Warrant was rubber stamped by Judge Arias.

40.     The Affidavit was created in retaliation against Plaintiff and was orchestrated, directed or performed by WILLIAMS, JAX SHERIFF, and LEEPER.

41.     Plaintiff's acknowledgment that there was beer in the car upon being asked by Ayoub and Short, also evidences a complete lack of intent to support the improperly obtained warrant.  These material facts were omitted from the Affidavit for Arrest Warrant and these material facts do not support criminal prosecution under Section 918.13(1)(b) or Section 777.04(3) Fla. Stat.  These critical material facts, and others, were omitted from the Affidavit for Arrest Warrant at the direction of WILLIAMS and LEEPER and their subordinates with intent or reckless disregard for the truth.  See Affidavit for Arrest Warrant attached hereto as Exhibit "A" and incorporated herein by reference.

42.     The Affidavit for Arrest Warrant omits the material fact that beer props were authorized in the vehicle for undercover officers as compliant with standard operating procedure.

43.     Because of the well-known mental, psychological and physical condition of Plaintiff as an officer in an OIS, protocol directs that Plaintiff may not be interviewed until after he was cleared by a physician and FOP.

44.     In violation of OIS protocol and SOP at the scene of the OIS, Plaintiff was shepherded into a police vehicle by Asst. Chief Scott Dingy, at which time Dingy reviewed with Plaintiff the protocol following a shooting by an officer. In that encounter with Dingy, Dingy noted the absence of any smell of alcohol emanating from Plaintiff's mouth and face. Plaintiff was informed that he was being placed on paid administrative leave pending an investigation of the shooting.

45.     The Affidavit for Arrest Warrant, Exhibit "A", dated February 16, 2017 clearly omits Plaintiff from the names of persons interviewed on the night of the OIS, however a recording of an utterance made 20 seconds after the OIS was improperly used in the Affidavit. In addition, the second to last paragraph of the Affidavit of Arrest Warrant states incorrectly that Plaintiff was "re-interviewed" by Integrity/Special Investigations Unit P.A. Bodine.  This is materially false.  Pursuant to the previous statements in the Affidavit of Arrest Warrant, Plaintiff was interviewed once.  Plaintiff knows he was interviewed once and that interview occurred simultaneous to the preparation of the arrest warrant for him.

46.     Plaintiff had to be/and was cleared by a physician and FOP before he was interviewed on February 16, 2017.

47.     The events of February 16, 2017 and the timing of the events are critical.  On February 16, 2017, upon Plaintiff's return from approximately ten (10) days of administrative leave, Plaintiff met with attorney Vogalsang at the FOP office for the purpose of giving his statement regarding the OIS. Plaintiff arrived at about 10:00 to 10:30 a.m.  At that time,

Vogalsang informed Plaintiff that Defendant JAX SHERIFF's administration, including WILLIAMS was already talking about arresting all three members of the undercover team, on charges of tampering with evidence, without having even taken a statement from or interviewing Plaintiff.

48.     Volgalsang said that JAX SHERIFF had already taken the position that the disposed of beer props—and for that matter the vehicle used by the undercover team—were evidence of a crime, and such tampering charges arose out of the disposal of the beer props by Kvies.

49.     JAX SHERIFF and WILLIAMS and LEEPER had already taken the position, without probable cause, that the disposed of beer props—and for that matter the vehicle used by the undercover team—were evidence of a crime, and such tampering charges arose out of the disposal of the beer props by Kvies.

50.     Plaintiff was quite certain--and remains certain--that under standard police protocol, and specifically under the protocol of Defendant JAX SHERIFF, the disposed of beer prop was not evidence.

51.     Plaintiff and his teammates, accompanied by Vogalsang, were then directed to be interviewed by Defendant JAX SHERIFF's Integrity Division in the Integrity Building. The Integrity Division is similar to internal affairs except that internal affairs investigates complaints against officers, and the Integrity Division investigates criminal charges against officers. During Plaintiff's interview which lasted approximately ten minutes and had begun at approximately 11:00 a.m., Vogalsang walked outside of the interview room with the integrity sergeant, and was informed that warrants had already been obtained for Plaintiff, Kvies' and Griffis's arrests, such

warrants charging all three with tampering with evidence and conspiracy to tamper with evidence.

52.     The Arrest Warrant was approved by Assistant State Attorney Mizrehi on February 16, 2017 and signed by Judge Arias.

53.     The Warrant Served Notification indicates that Plaintiff was served on February 16, 2017 by Officer Maria McKenzie.

54.     The jail is located approximately twenty (20) minutes from the Integrity Building.

55.     The Arrest and Booking Report indicates that Plaintiff was admitted to the jail at 12:20 on February 16, 2017.

56.     It took a mere one hour and twenty minutes from the beginning of Plaintiff's interview to his booking at the jail for a crime he did not have the mental capacity to commit, and pursuant to an Affidavit for Arrest Warrant that contained materially false statements and omitted critical material statements of fact.

57.     The timeline of events makes it clear that JAX SHERIFF, WILLIAMS, and LEEPER utilized the legal system to obtain a warrant based upon incorrect and incomplete facts; used the legal system to obtain an arrest warrant prior to interviewing Plaintiff.

58.     The arrest warrant was a prop in that WILLIAMS, Pat Ivey, Volgalsang, and Dingy had a round table meeting to decide to arrest Plaintiff and decided to investigate, arrest and otherwise retaliate against Plaintiff long before obtaining probable cause and in spite of the lack of probable cause for arrest of Plaintiff.  The arrest was made even after Dingy, Sargent in the Cold Case division, advised that they did not have probable cause to arrest Plaintiff.

59.     It is clear that WILLIAMS and JAX SHERIFF did not talk to, or WILLIAMS and JAX SHERIFF decided not to include the material fact that Ayoub and Short asked almost

simultaneously of Plaintiff upon arrival at the scene of the OIS, "have y'all been drinking," to which Plaintiff responded, "no, but there is beer in the car" in the Affidavit for Arrest Warrant.

60.     The Affidavit for Arrest Warrant is based almost exclusively upon the iPhone recording and no examination of the contents of the vehicle, no interview with Ayoub or Short who spoke to Plaintiff at the scene or with Plaintiff and no interview of Plaintiff.

61.     The Affidavit of Arrest Warrant makes materially false statements in that Plaintiff did not admit that he told Kvies to discard beer cans.  In fact, Plaintiff, because of the psychological defense mechanism associated with 20 seconds post OIS had, and to this day continues to have, no recollection of the conversation whatsoever and in fact told Officers who arrived on the scene that there was beer in the car.

62.     Melissa Nelson, State Attorney, said that the Mizrehi acted prematurely in signing the arrest warrant and that there was no probable cause.

63.     Deference to a magistrate in search warrant matters is not boundless and deference accorded finding of probable cause does not preclude inquiry into the knowing or reckless falsity of the affidavit on which that determination was based and a magistrate must purport to perform his neutral and detached function and not serve merely as a rubber stamp for the police. U.S.C.A. Const. Amend. 4. United States v. Leon, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984).

64.     Judge Arias served as merely as a rubber stamp because the Affidavit for Arrest Warrant states itself that Plaintiff was faced with a statement from Kievs 20 seconds after an OIS where Plaintiff had just shot and killed a man and that beer props were permitted by policy in undercover officer vehicles.

65.     Judge Arias should have known that any statement by Plaintiff 20 seconds after OIS by Plaintiff was not permissible in such an Affidavit and would never be admissible evidence against Plaintiff and could not support probable cause for issuance of a warrant for Plaintiff's arrest.

66.     Judge Arias should have known that the beer props were permissible in the undercover sheriff vehicle and would never be admissible evidence against Plaintiff and could not support probable cause for issuance of a warrant for Plaintiff's arrest.

67.     The warrant is void.

68.     Because the affidavit contained false statements which materially affect its showing of probable cause, the warrant based upon it is rendered invalid.

69.     Because if the omitted facts from the Affidavit for Arrest Warrant had been added to it, it would defeat probable cause, the warrant must be voided.

70.     There is lack of probable cause for the arrest warrant for Plaintiff or to arrest Plaintiff.

71.     There is also a lack of arguable probable cause to arrest Plaintiff.

72.     Reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could not have believed that probable cause existed to arrest Plaintiff.

73.     The timeline of events makes it clear that JAX SHERIFF and WILLIAMS participated in retaliation against Plaintiff for his protected speech and his constitutional right to run for Sheriff against Henderson by obtaining a void warrant, a false arrest and selective prosecution.

74.     The timeline of events makes it clear that JAX SHERIFF engaged in a conspiracy with WILLIAMS and LEEPER to obtain a void warrant, a false arrest and selective prosecution of Plaintiff.

75.     The timeline of events makes it clear that JAX SHERIFF engaged in a conspiracy with WILLIAMS and LEEPER to selectively prosecute Plaintiff in that Griffis and Kvies, the officers liable for the criminal violations, were not prosecuted.

76.     The timeline of events makes it clear that JAX SHERIFF with WILLIAMS and LEEPER obtained the false arrest and attempted prosecution of Plaintiff.

77.     The Affidavit for Arrest Warrant contains a false statement made knowingly and intentionally, or with reckless disregard for the truth, the Plaintiff had been re-interviewed, and a false statement that Plaintiff told Kvies to discard the beer cans, that resulted in a warrant being issued without probable cause. Plaintiff actually had no recollection of the conversation. Plaintiff was interviewed one time simultaneous to the issuance of the arrest warrant at which time it was evident he has no recollection of the communication with Kvies at the time of the OIS.  The Affidavit also omits the material fact that Plaintiff told Ayoub and Short upon their arrival that there was beer in the car.  These false statements and omissions were made at the direction of JAX SHERIFF and WILLIAMS and LEEPER.

78.     Upon his arrest, Plaintiff was placed on administrative leave without pay, and was released on his own recognizance ("ROR").

79.     Importantly, approximately two days following the February 6, 2017 OIS, when the Jeep Cherokee that the team had been using was next issued for use, two officers found the bag of cocaine from the night of Plaintiff's OIS on the back floor. Finding the bag in that manner

demonstrates that notwithstanding statements made on behalf of Defendant JAX SHERIFF that the beer props and the vehicle were evidence, the vehicle had not been processed as evidence.

80.     The criminal case against Plaintiff was dropped.  Prosecutors cited several reasons for their decision to drop the cases, critically, one of which was that the detectives were allowed by JAX SHERIFF to use beer props while working undercover. This material fact was knowingly omitted from the Affidavit for Arrest Warrant by or at the direction or under the supervision of WILLIAMS and JAX SHERIFF.

81.     "The likely and only demonstrable motive for the removal of these beer props from the undercover vehicle was to avoid any potential discipline issues from their supervisors about misusing props, and not to interfere with the OIS investigation," prosecutors said in court documents.

82.     Plaintiff agreed to resign from the Sheriff's Office and permanently surrender his state-issued law enforcement certificate after he was told that he would only ever have a desk job after that and that he was effectively being blocked from every performing the duties of a police officer or undercover office by JAX SHERIFF and WILLIAMS in retaliation for his statements that he would be running for sheriff.

83.     However, Kvies and Griffis merely completed community service hours to avoid prosecution.

84.     The selective prosecution of Plaintiff was in retaliation for his statements that he was running for sheriff.

85.     The selective prosecution of Plaintiff was part of a conspiracy between WILLIAMS and LEEPER to deprive Plaintiff of his employment, his retirement, and his opportunity to run for sheriff.

86.     The arrest was not objectively reasonable under the totality of the circumstances.

87.     The arresting officer was instructed by WILLIAMS not to conduct or failed to conduct a reasonable investigation in order to determine if probable cause existed for Plaintiff's arrest.

88.     The circumstances are insufficient to cause a reasonably cautious person to believe that the Plaintiff was guilty of a criminal offense at the time of his arrest.

89.     Officers similarly situated to Plaintiff did not have their beer props treated as evidence in the investigation of an OIS, were not arrested or prosecuted as was Plaintiff.  And in fact, the officers at the very OIS with Plaintiff who actually disposed of the beer props and engaged in the discussion, to the exclusion of Plaintiff, about it were given community service hours to avoid prosecution while Plaintiff was prosecuted. Therefore, it is clear that JAX SHERIFF and WILLIAMS would not have taken/and did not take the same actions irrespective of Plaintiff's protected speech.

90.     The arrests of Griffis and Kvies were effectuated for the sole purpose of arresting Plaintiff without it appearing suspect.

91.     Others similarly situated to Plaintiff include two separate white undercover officers, on two separate occasions, Jay Taylor and Brad Cole, both OIS who shot and killed black citizens in the same neighborhood.  The beer that each of those officers had in their vehicles was never vouchered as or otherwise treated as evidence and no recording made of their speech 20 seconds after the shooting were used against them.

92.     At the time of Plaintiff's arrest, he had no idea why he was being singled out for arrest unlike his comparators. However, he subsequently learned that the same was retaliation for his having made public his intention to run for the position of sheriff of Nassau County in 2020

and his speech around that run for office including his expression of confidence to WILLIAMS at a party that he was certain he would win against Henderson, WILLIAM's prior supervisor.

93.     More specifically, two weeks prior to the OIS of February 6 2017, Plaintiff attended a political event as a guest of WILLIAMS, which took place at a location called Top Golf, an indoor driving range, bar and restaurant. At that event, in discussing Plaintiff's candidacy for sheriff of Nassau County in 2020, Defendant WILLIAMS cornered Plaintiff for over a half hour and told Plaintiff that "you have enough backing that you may win," against Roy Henderson, and continued to push Plaintiff repeatedly for a reason why he was running against Henderson.  Plaintiff told WILLIAMS that he not only had enough backing to win, but that he in fact was going to win the election.

94.     Further, approximately a week following his arrest, Plaintiff was visited at his home by Ray Bullard, a retired firefighter who at that time held a part-time position with Defendant NASSAU SHERIFF supervising inmates. In their conversation, Bullard referenced Roy Henderson, a man commonly known as Defendant WILLIAMS' "Work  Daddy" because Henderson was previously WILLIAMS' supervisor at JAX SHERIFF, indicating that Henderson also intended to run for sheriff of Nassau County in 2020.  Bullard had heard Henderson talking about his intention to run for that position, and his statement that "I can't beat Bryan [TURNER], but Mike [WILLIAMS] will take care of that." Bullard also communicated that he had heard Henderson say that Defendant WILLIAMS was communicating with Defendant LEEPER about Plaintiff's and Henderson's candidacies for sheriff of Nassau County, and that the two had agreed to take all actions necessary to assure Plaintiff's defeat in the 2020 election.

95.     WILLIAMS communicated to that he would take action against Plaintiff that would take him out of the race for Sheriff against Henderson.

96.     WILLIAMS and LEEPER engaged in communication and agreed to take all necessary action to assure Plaintiff's defeat in the 2020 election, including use of the personnel in the JAX SHERIFF to effectuate an Affidavit for Arrest Warrant the omitted material facts, and included information protected by SOP and Plaintiff's rights, included statements made within 20 seconds of an OIS not obtained through interview and otherwise protected speech or inadmissible speech, obtained the arrest warrant without probable cause and against the advice of Cold Case, under a magistrate who rubber stamped the Affidavit of Search Warrant, and prosecuted Plaintiff while not prosecuting the actual perpetrators of the crime Kievs and Griffis.

97.     WILLIAMS and LEEPER individually, in combination, and in concert, engaged in a series of subsequent actions stated herein directed toward assuring that Plaintiff be defeated in the 2020 election for sheriff of Nassau County. These actions began with violations of SOP and other procedures at the scene of the OIS, included the manner in which the Affidavit for Arrest Warrant was prepared, and the process by which the arrest warrant and arrest and prosecution of Plaintiff proceeded.

98.     In late August of 2017, the state attorney dropped all criminal charges against Plaintiff.

99.     Representatives of Defendant JAX SHERIFF having made it clear that should Plaintiff continue in its employ he would be assigned for the rest of his career to "teleserve"— i.e., to answering telephones—on the day following the dropping of charges against him, Plaintiff submitted to an assistant chief in Defendant JAX SHERIFF's human resources division written notice of his retirement.

100.    Others officers in the employ of Defendant JAX SHERIFF were treated differently, and not arrested following similar events. In addition to the substantially different

treatments of Taylor and Cole, described above, as another example, Short deleted his work phone after being told it was evidence. However, Short was only removed from the narcotics division as discipline, and not arrested.

101.   Further, after Plaintiff was arrested, there have been at least three other officers who have been accused of tampering with evidence, but they were not criminally charged or arrested by Defendant JAX SHERIFF.   Instead, internal investigations were conducted, and they were disciplined minimally, placed in teleserve only temporarily, not terminated, and quickly returned to their prior positions.

102.   Still further, a Brian or Frank Sterner was charged internally for tampering with evidence--destroying marijuana--and for falsifying a police report, and his discipline was limited to being temporarily assigned to teleserve.

103.   Further, Billy Johns was accused of tampering with evidence after he threw away a crack pipe in front of a community resource officer.  Johns' discipline was similarly being assigned temporarily to teleserve.

104.   Yet further, a Tyler Cowan or Tyler Cowens, whose father is an assistant chief within Defendant JAX SHERIFF, was only given a formal counseling for tampering with evidence after destroying witness statements.

105.   Plaintiff was arrested and prosecuted without due process of law.

106.   Plaintiff also became the victim of various retaliatory actions by Defendants LEEPER and NASSAU SHERIFF following his arrest by Defendant JAX SHERIFF. By way of example only, following his arrest Plaintiff being on administrative leave from Defendant JAX SHERIFF and therefore newly interested in remedying the clerical error through which he had previously not received a retired deputy identification card from Defendant NASSAU SHERIFF,

in response to Plaintiff's request for the same Defendant LEEPER refused to provide the same. However, Defendant LEEPER in fact provided such replacement identification cards to several other deputies during this period.

107.    The retaliatory actions against Plaintiff have continued and remain ongoing. As an example of such further retaliation, on February 15 2018 Plaintiff requested of Defendant NASSAU SHERIFF to do a retirement shooting requalification, for the purpose of being permitted to continue carrying a weapon. This request was denied by Alton Kelly of Defendant NASSAU SHERIFF in an email sent to Plaintiff on February 21 2018.

108.    Plaintiff has retained the undersigned to represent his interests in this cause and is obligated to pay a reasonable fee for these services. Defendants should be made to pay said fee, along with all reasonable expenses incurred in connection with this action, under applicable law.

**COUNT I-FIRST AMENDMENT RETALIATION (against Defendant JAX SHERIFF)**

109.    Paragraphs 1-30, 31-73, 76-84, 86-95,98-106, 107,108 above are re-alleged and incorporated.

110.    This count sets forth a claim against Defendant JAX SHERIFF for First Amendment retaliation, and is brought through 42 U.S.C. §1983.

111.    Defendant JAX SHERIFF engaged in actions in violation of Plaintiff's rights under the First Amendment of the United States Constitution.

112.    These violations were of the type and character as to which any reasonable person or institution would be aware.

113.    Plaintiff's rights to freedom of political expression, association, participation and belief were violated.

114.    Public employees like Plaintiff have the right to engage in First Amendment activities without the fear of reprisal.

115.    Plaintiff, as set forth in part above, engaged in constitutionally protected activity by stating his intention to run for the office of sheriff of Nassau County.

116.    After engaging in this protected activity, Plaintiff was the victim of retaliatory actions as set forth in part above.

117.    Defendant JAX SHERIFF infringed on Plaintiff's constitutionally protected interests under the First Amendment by taking adverse actions against him in retaliation for his protected activity.

118.    Defendant JAX SHERIFF's actions against Plaintiff set forth above constituted retaliatory conduct that would deter a person of ordinary sensibilities from exercising his or her First Amendment rights.

119.    Plaintiff's protected activities were substantial or motivating factors in the adverse actions taken against him.

120.    The conduct Defendant JAX SHERIFF engaged in was in callous and willful disregard of Plaintiff's constitutional rights.

121.    Defendant JAX SHERIFF is a person under the laws applicable to this action.

122.    Defendant WILLIAMS, who personally participated in adverse actions against Plaintiff in violation of his First Amendment right to free speech and to run for political office, is a final policymaker for Defendant JAX SHERIFF. Defendant WILLIAMS was the final decisionmaker in each decision to take adverse employment action against Plaintiff after he engaged in protected First Amendment activity.

123. At all times pertinent hereto, Defendant JAX SHERIFF acted under color of state law when it made the decision and/or participated in the adverse employment actions against Plaintiff.

124. Defendant JAX SHERIFF's participation in disciplining and/or terminating Plaintiff was the type of retaliatory conduct that would deter a person of ordinary sensibilities from exercising his or her First Amendment rights.

125. The actions by and on behalf of Defendant JAX SHERIFF set forth in this count were not unique events of the violations set forth herein. On information and belief, further similar events of wrongful actions on the part of Defendant JAX SHERIFF and/or its employees or agents have taken place, such events combining to determine a pattern of similar wrongful and illegal behavior.

126. As a direct and proximate result of the actions of Defendant JAX SHERIFF, Plaintiff has suffered lost wages, benefits and other tangible damages. He also sustained emotional pain and suffering damages, loss of the capacity for the enjoyment of life and other intangible damages. These losses have occurred in the past, are occurring at present, and are likely to continue into the future. Plaintiff is also entitled to equitable/injunctive relief under this count.

### COUNT II-FIRST AMENDMENT RETALIATION (against Defendant WILLIAMS)

127. Paragraphs 1-73, 76-84, 86-95, 98-108 above are re-alleged and incorporated.

128. This count sets forth a claim against Defendant WILLIAMS for First Amendment retaliation, and is brought through 42 U.S.C. §1983.

129. Defendant WILLIAMIS took actions in violation of Plaintiff's rights under the First Amendment of the United States Constitution.

130.    These violations were of the type and character as to which any reasonable person would be aware.

131.    Plaintiff's rights to freedom of political expression, association, participation and belief were violated.

132.    Public employees like Plaintiff have the right to engage in First Amendment activities without the fear of reprisal.

133.    Plaintiff, as set forth in part above, engaged in constitutionally protected activity by stating his intention to run for the office of Sheriff of Nassau County.

134.    After engaging in this protected activity, Plaintiff was the victim of retaliatory actions as set forth in part above.

135.    Defendant WILLIAMS infringed on Plaintiff's constitutionally protected interests under the First Amendment by taking adverse actions against him in retaliation for his protected activity.

136.    Defendant WILLIAMS's actions against Plaintiff set forth above constituted retaliatory conduct that would deter a person of ordinary sensibilities from exercising his or her First Amendment rights.

137.    Plaintiff's protected activities were substantial or motivating factors in the adverse actions taken.

138.    The conduct that Defendant WILLIAMS engaged in was in callous and willful disregard of Plaintiff's constitutional rights, thereby authorizing an award of punitive damages against Defendant WILLIAMS.

139.    Defendant WILLIAMS is a person under the laws applicable to this action.

140.    Defendant WILLIAMS personally participated in adverse actions against Plaintiff in violation of his First Amendment right to free speech and to run for political office. Defendant WILLIAMS was the final decisionmaker in the decisions to take adverse employment actions against Plaintiff after he engaged in protected First Amendment activity.

141.    At all times pertinent hereto, Defendant WILLIAMS acted under color of state law when he made the decisions and/or participated in the adverse employment actions against Plaintiff.

142.    Defendant WILLIAMS' participation in disciplining and/or terminating Plaintiff was the type of retaliatory conduct that would deter a person of ordinary sensibilities from exercising his or her First Amendment rights.

143.    Defendant WILLIAMS acted with malice against Plaintiff and/or in reckless disregard of his clearly established rights under the First Amendment.

144.    As a direct and proximate result of the actions of Defendant WILLIAMS, Plaintiff has suffered lost wages, benefits and other tangible damages. He also sustained emotional pain and suffering damages, loss of the capacity for the enjoyment of life and other intangible damages. These losses have occurred in the past, are occurring at present, and are likely to continue into the future. Plaintiff is also entitled to punitive damages against Defendant WILILAMS under this count, as well as to equitable/injunctive relief.

### COUNT III-FIRST AMENDMENT RETALIATION
### (against Defendant NASSAU SHERIFF)

145.    Paragraphs 1- 30, 32-72, 76-82, 84-95, 96-108 above are re-alleged and incorporated.

146.    This count sets forth a claim against Defendant NASSAU SHERIFF for First Amendment retaliation, and is brought through 42 U.S.C. §1983.

147.     Defendant NASSAU SHERIFF acted in violation of Plaintiff's rights under the First Amendment of the United States Constitution.

148.     These violations were of the type and character as to which any reasonable person would be aware.

149.     Plaintiff's rights to freedom of political expression, association, participation and belief were violated.

150.     Public employees like Plaintiff have the right to engage in First Amendment activities without the fear of reprisal.

151.     Plaintiff, as set forth in part above, engaged in constitutionally protected activity by stating his intention to run for the office of Sheriff of Nassau County.

152.     After engaging in this protected activity, Plaintiff was the victim of retaliatory actions as set forth in part above.

153.     Defendant NASSAU SHERIFF infringed on Plaintiff's constitutionally protected interests under the First Amendment by taking adverse actions against him in retaliation for his protected activity.

154.     Defendant NASSAU SHERIFF's actions against Plaintiff set forth above constitute retaliatory conduct that would deter a person of ordinary sensibilities from exercising his or her First Amendment rights.

155.     Plaintiff's protected activities were substantial or motivating factors in the adverse actions taken against him.

156.     The conduct Defendant NASSAU SHERIFF engaged in was in callous and willful disregard of Plaintiff's constitutional rights.

157.    Defendant NASSAU SHERIFF is a person under the laws applicable to this action.

158.    Defendant LEEPER personally participated in adverse actions against Plaintiff in violation of his First Amendment right to free speech and to run for political office, and is a final policymaker for Defendant NASSAU SHERIFF. Defendant LEEPER was the final decisionmaker in the decisions to take adverse actions against Plaintiff after he engaged in protected First Amendment activity.

159.    At all times pertinent hereto, Defendant NASSAU SHERIFF acted under color of state law when it made the decisions and/or participated in the adverse actions against Plaintiff.

160.    Defendant NASSAU SHERIFF's participation in disciplining and/or terminating Plaintiff was the type of retaliatory conduct that would deter a person of ordinary sensibilities from exercising his or her First Amendment rights.

161.    The actions by and on behalf of Defendant NASSAU SHERIFF set forth in this count were not unique events of the violations set forth herein. On information and belief, further similar events of wrongful actions on the part of Defendant NASSAU SHERIFF and/or its employees or agents have taken place, such events combining to determine a pattern of similar wrongful and illegal behavior.

162.    As a direct and proximate result of the actions of Defendant NASSAU SHERIFF, Plaintiff has suffered lost wages, benefits and other tangible damages.  He also sustained emotional pain and suffering damages, loss of the capacity for the enjoyment of life and other intangible damages. These losses have occurred in the past, are occurring at present, and are likely to continue into the future. Plaintiff is also entitled to equitable/injunctive relief under this count.

**COUNT IV-COMMON LAW CIVIL CONSPIRACY (against the Individual Defendants)**

163.    Paragraphs 1-83, 85-106, 108  above are re-alleged and incorporated.

164.    This count sets forth claim against the Individual Defendants for civil conspiracy under the common law of Florida.

165.    The Individual Defendants acted as conspirators to take actions against Plaintiff as set forth above. Thus, the underlying actionable torts or other actions, which constituted the purposes of the conspiracy, include but are not limited to false arrest.

166.    Alternatively, the Individual Defendants are liable for the tort of civil conspiracy, standing alone, based upon the exceptional circumstances surrounding the facts of this case which have led to the instant action.

167.    The term of the conspiracy commenced prior to Plaintiff's wrongful arrest, and has been ongoing.

168.    The conspiracy among the Individual Defendants was a conspiracy to do one or more unlawful acts by unlawful means.

169.    Each of the Individual Defendants engaged in overt acts in furtherance of the conspiracy, as described above.

170.    The damages to Plaintiff were in violation of his constitutional protections under the First Amendment of the United States Constitution. Plaintiff has been damaged as set forth above.

171.    As a direct and proximate result of the Individual Defendants' actions against Plaintiff, Plaintiff has suffered the injuries described above, including lost wages, loss of reputation, pain and suffering, mental anguish, loss of ability to enjoy life, expenses of medical care and treatment, and other tangible and intangible damages. These injuries and losses have

occurred in the past, are occurring at present, and likely will continue into the future. Plaintiff also entitled equitable/injunctive relief and to punitive damages under this count.

**COUNT V-FALSE IMPRISONMENT/ARREST (against Defendant JAX SHERIFF)**

172.    Paragraphs 1-73,76-83, 87-95, 98-106, 108  above are re-alleged and incorporated.

173.    This count sets forth a claim against Defendant JAX SHERIFF for false imprisonment/arrest and is brought under the common law of Florida. This count is pled in the alternative, and for purposes of this count, the actions of one or more of the officers, employees or agents of Defendant JAX SHERIFF were committed within the course and scope of their employment.

174.    Plaintiff is entitled to relief against Defendant JAX SHERIFF in that through its officers, employees and agents, it intentionally and unlawfully detained and restrained Plaintiff against his will, deprived Plaintiff of his liberty without any reasonable cause, and maintained such complete restraint and deprivation for a period of time.

175.    This unlawful restraint of the Plaintiff's liberty was also accomplished by Defendant JAX SHERIFF confining Plaintiff to an area in which Plaintiff did not wish to be confined, and/or by compelling Plaintiff to go where he did not wish to go.

176.    Plaintiff was further restrained by Defendant JAX SHERIFF, through its officers', agents' or employees' use of coercive words, threats of force and immediate means of coercion against Plaintiff so that Plaintiff was restrained and deprived of liberty. Defendant JAX SHERIFF restrained Plaintiff without any justification. Defendant JAX SHERIFF sanctioned and/or ratified the misconduct of its officers, employees or agents in that it was aware of their misconduct and approved their decisions.

177.    At all times material to this action, and at all times during which Plaintiff was being unlawfully restrained, Plaintiff was restrained against his will and without consent, so that Plaintiff was not free to leave his place of confinement.

178.    As a direct and proximate cause of Defendant JAX SHERIFF's actions, Plaintiff has been damaged, which damages include: mental anguish, pain and suffering, loss of capacity for the enjoyment of life, lost wages, lost capacity to work embarrassment, humiliation, loss of reputation, and other tangible and intangible damages. These damages have occurred in the past, are occurring at present, and will likely continue into the future. Plaintiff is also entitled to equitable/injunctive relief under this count.

**COUNT VI-FALSE IMPRISONMENT/ARREST (against Defendant WILLIAMS)**

179.    Paragraphs 1- 73, 76-83, 86-95, 98-106, 108 above are re-alleged and incorporated.

180.    This count sets forth a claim against Defendant WILLIAMS for false imprisonment/arrest brought under the common law of Florida. This count is pled in the alternative, and for purposes of this count, the actions by Defendant WILLIAMS were committed outside the course and scope of his employment.

181.    Plaintiff is entitled to relief against Defendant WILLIAMS in that he intentionally and unlawfully detained and restrained Plaintiff against his will, deprived Plaintiff of his liberty without any reasonable cause, and maintained such complete restraint and deprivation for a period of time.

182.    This unlawful restraint of Plaintiff's liberty was also accomplished by Defendant WILLIAMS confining Plaintiff to an area in which Plaintiff did not wish to be confined and/or by compelling Plaintiff to go where he did not wish to go.

30

183.     Plaintiff was further restrained by Defendant WILLIAMS' use of coercive words, threats of force as well as actual force, and immediate means of coercion against Plaintiff so that Plaintiff was restrained and deprived of liberty. Defendant WILLIAMS caused Plaintiff to be restrained without any justification.

184.     At all times material to this action, and at all times during which Plaintiff was being unlawfully restrained, Plaintiff was restrained against his will and without consent, so that Plaintiff was not free to leave his place of confinement. Defendant WILILAMS acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights or safety.

185.     As a direct and proximate cause of Defendant WILLIAMS' actions, Plaintiff has been damaged, which damages include: mental anguish, pain and suffering, loss of capacity for the enjoyment of life, lost wages, lost capacity to work, embarrassment, humiliation, loss of reputation, and other tangible and intangible damages. These damages have occurred in the past, are occurring at present, and will likely continue into the future. Plaintiff is also entitled to equitable/injunctive relief under this count, as well as to punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants for the following:

(a)     that process issue and this court take jurisdiction over this cause;

(b)     that this court enter judgment against Defendants and for Plaintiff granting equitable relief against Defendants under the applicable counts set forth above, mandating Defendants' obedience to the laws enumerated herein and providing other equitable relief to Plaintiff;

(c)     that this court enter judgment against Defendants and for Plaintiff awarding all legally-available general and compensatory damages, including damages for economic loss, to Plaintiff from Defendants for Defendants' violations of law enumerated herein;

(d)     that this court enter judgment against Defendants and for Plaintiff permanently enjoining Defendants from future violations of law enumerated herein;

(e)     that this court enter judgment against Defendants and for Plaintiff awarding Plaintiff costs and attorney's fees as allowed by law;

(f)     that this court enter judgment against Defendants and for Plaintiff awarding Plaintiff interest where appropriate;

(g)     that this court enter judgment against Defendants and for Plaintiff awarding Plaintiff punitive damages against the Individual Defendants; and

(h)     that this court grant such other and further relief as is just and proper under the circumstances.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury on all issues herein that are so triable.

Respectfully submitted:

/s/ Marie A. Mattox
Marie A. Mattox [FBN 0739685]
MARIE A. MATTOX, P. A.
203 North Gadsden Street
Tallahassee, FL 32301
Telephone: (850) 383-4800
Facsimile: (850) 383-4801
ATTORNEYS FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that a true and correct copy of the foregoing has been furnished to all counsel of record by CM/ECF this 8th day of June, 2020.

<u>/s/ Marie A. Mattox</u>
Marie A. Mattox